## Isaiah WEBB, Appellee,

v.

## THE DISTRICT OF COLUMBIA, Appellant.

No. 97–7165.
Consolidated with
No. 97–7239.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 14, 1998.

Decided July 7, 1998.

Donna M. Murasky, Assistant Corporation Counsel, argued the cause for appellant, with whom John M. Ferren, Corporation Counsel, Charles L. Reischel, Deputy Corporation Counsel, and Carol E. Burroughs, Assistant Corporation Counsel, were on the briefs.

Lynn Estes Calkins argued the cause for appellee, with whom Michael L. Martinez, Melinda Burrows, and Theodore W. Small, Jr., were on the brief.

Before: WALD, WILLIAMS, and GARLAND, Circuit Judges.

WALD, Circuit Judge:

In 1990, Isaiah Webb ("Webb"), an African-American male correctional officer, sued the District of Columbia Department of Corrections ("the District"), alleging that he had been unlawfully denied promotion to more than one hundred positions for which he had applied. In 1994, the District terminated Webb for sexually harassing two female co-workers. After the district court dismissed many of his claims, Webb filed an amended complaint in 1996 that limited his claims of discrimination to three positions and added a claim of retaliatory termination. As discovery proceeded, it became clear that the District, in accordance with general internal policies and in contravention of federal regulations, had discarded portions of Webb's personnel file as well as other files relevant to the positions at issue. Webb moved for sanctions, and the district court, concluding that the destruction of documents was too extensive to permit a trial to go forward, entered a default judgment against the District and ordered that Webb be placed in one of the positions for which he had applied, declining to consider the District's evidence of Webb's harassment activities. Because we believe that the district court did not give adequate consideration either to alternative sanctions or to the District's harassment evidence, we vacate the default judgment against the District and remand for further proceedings.

## I. BACKGROUND

Webb was hired as a probationary correctional officer with the District in January 1973 at a DS-6 level. He received numerous promotions and wage increases throughout the succeeding years, eventually attaining the rank of Supervisory Correctional Officer, a DS-11 position, by 1990. At this point, in Webb's view, his ascent stalled. On November 13, 1990, after exhausting his administrative remedies, Webb brought a *pro se* suit against the District, alleging that between November 1983 and November 1990, he had applied for and was denied promotion to more than one hundred positions[1] on the

---

1. Webb's initial complaint did not identify any specific position to which he had been allegedly denied promotion. His first amended complaint included claims that he had been denied promotion to several positions in retaliation for his protected activity. On May 12, 1992, the district court directed Webb to file a second amended complaint setting forth with particularity the positions for which he applied and was not selected. That complaint, filed on September 9, 1992, listed sixty-nine individuals who Webb claimed had been selected over him for various positions, although the complaint noted that Webb's claims were not limited to those examples.

In 1992, Webb was promoted to a DS-12 chaplain's position but contended that the discriminatory denial of more than one hundred DS-12 positions from 1983 to 1992 hampered his advancement to DS-13 and DS-14 positions. *See*

basis of his sex, race, and/or personal appearance in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981.[2] Webb sought an injunction ordering the District to promote him and an award of back pay. In June 1994, while proceedings in his nonselection suit were ongoing, the District terminated Webb for the sexual harassment of two female co-workers, Barbara Shank ("Shank") and Sandra Stevens ("Stevens").

The District moved to dismiss the nonselection suit or, in the alternative, for summary judgment. In *Webb v. District of Columbia (Webb I)*, 864 F.Supp. 175 (D.D.C. 1994), the district court granted the motion in part and denied it in part, retaining only ten of Webb's claims of racial discrimination, seventeen of his claims of sex discrimination, and forty-two of his claims of retaliation.[3] The court also granted Webb leave to amend his complaint to add a claim of retaliatory discharge and race/sex discrimination resulting from his 1994 termination. *Id.* at 187. On November 1, 1996, Webb (for whom counsel had been appointed) filed his fourth amended complaint. The complaint limited Webb's claims of discrimination to three positions—Special Assistant, Correctional Program Officer, and Supervisor Correctional Officer/Major[4]—and included a claim of retaliatory discharge pursuant to 42 U.S.C.

§ 2000e–3. With the scope of the suit thus narrowed, the district court ordered that the discovery process conclude by February 24, 1997,[5] and set a trial date of March 24, 1997. *Webb v. Government for Dist. of Columbia, Dep't of Corrections (Webb II)*, 175 F.R.D. 128, 130 (D.D.C.1997).

Beginning in 1990, Webb had served on the District numerous requests and interrogatories asking for information and documents relating to his nonselection and termination claims. His ninth such request, on October 30, 1996 (the first to be prepared by counsel), included a request for documents from Webb's personnel file as well as documents from the "merit case files" for the positions identified in his complaint.[6] After the District informed Webb's counsel that it could not locate Webb's personnel file, Webb moved for sanctions as well as to compel the District's full response to his discovery requests. As part of its opposition to Webb's motion, the District submitted two declarations to explain its inability to comply fully with Webb's requests. In the first declaration, Joan Murphy ("Murphy"), a Supervisory Personnel Management Specialist with the District of Columbia, stated that she believed that the merit case files relevant to Webb's case were destroyed two years after the end of the selection process in accordance with

---

*Webb v. District of Columbia*, 864 F.Supp. 175, 179 n. 3 (D.D.C.1994).

**2.** Webb also asserted claims under other federal and constitutional provisions; these claims, as well as his allegations of discrimination based on personal appearance, were eventually abandoned.

**3.** The grounds for dismissal included failure to state a claim for which relief could be granted, failure to exhaust administrative remedies and untimeliness. *See, e.g., Webb I*, 864 F.Supp. at 181 (noting that eleven of the selectees listed in the complaint appeared twice and that of the remaining selectees, eighteen were black males).

**4.** Webb identified the following positions and vacancy announcement numbers: Special Assistant to the Director (DC–89–125); Major (DC–90–167); and Correctional Program Officer (DC–89–163). Patricia Britton was selected for DC–89–125. Webb claimed that Robert Fulton and Steven Smith were selected for DC–90–167; the District asserted that although these two were among the individuals selected for the position,

the position was ultimately not filled and both men subsequently were promoted to Major through other applications. The District also claimed that no vacancy announcement numbered DC–89–163 existed and that the selectee for DC–89–63, for which Webb applied, was an African–American male. Webb abandoned this claim during pretrial proceedings, thus limiting his claims of discrimination to two positions.

**5.** Discovery had originally been scheduled to conclude by January 24, 1997, but the district court extended the period by one month due to the District's "failure to produce discovery in a timely fashion." *Webb v. Government for Dist. of Columbia, Dep't of Corrections*, 175 F.R.D. 128, 130 (D.D.C.1997).

**6.** "Merit case files" are used by the District of Columbia's Office of Personnel for each job vacancy and generally contain the qualification standard for the position, the applications received, and paperwork relating to the selection process and decision. *Webb II*, 175 F.R.D. at 135.

District regulations. In the second declaration, Karen Adams ("Adams"), also a Supervisory Personnel Management Specialist with the District of Columbia, stated that although she had located Webb's personnel file, all "temporary records" had been removed and discarded in preparation for routine archiving. Although Adams could not identify the number or content of any discarded documents, she noted that the term "temporary records" would include corrective or adverse action final decision letters as well as official reprimands.[7] The District thus asserted that it had responded to the bulk of Webb's requests and where it had not done so, it had acted in good faith. *See* Defendant's Opposition to Plaintiff's Motion to Compel and Request for Sanctions (February 3, 1997).

On March 1, 1997, the district court granted Webb's motion for sanctions for destruction of the documents, stating that the appropriate sanction would be determined at a later date. The court also granted Webb's motion to compel and ordered the District to respond fully to Webb's discovery requests by March 6, 1997, and to provide written confirmation of its compliance. The District's supplementary responses, *inter alia*,

identified Walter Ridley and Earthel C. Foster as individuals who participated in the selection process for vacancy announcement 89–125 and Bernard Braxton, Douglas Stempson, and Warren Bragg as the interviewing committee for vacancy announcement 90–167.[8]

■ On March 20, 1997, the second day of the pretrial conference, the court informed the parties that it would enter a default judgment in Webb's favor. It thus vacated the trial date and requested that Webb submit proposed findings of fact and conclusions of law. The District moved for reconsideration. On August 4, 1997, the district court denied the District's motion, finding that because the destruction of documents was "far more extensive than originally represented," the only appropriate action was the entry of a default judgment in Webb's favor. *Webb II*, 175 F.R.D. at 129. Because "[a] sanction for failure to preserve evidence is appropriate only when a party has consciously disregarded its obligation to do so," *Shepherd v. American Broadcasting Cos., Inc.*, 62 F.3d 1469, 1481 (D.C.Cir.1995), the district court first determined whether the District had knowingly violated 29 C.F.R. § 1602.31,[9]

7. Notwithstanding Adams's statement, the District's supplemental responses to Webb's discovery request failed to note, as required by the document request, that portions of Webb's personnel file had been destroyed, a failure the district court characterized as a "glaring omission." *Webb II*, 175 F.R.D. at 134.

8. In the joint pretrial statement submitted to the district court, the District identified Walter Ridley, Earthel Foster, and Bernard Braxton as witnesses to be called to testify on the selection processes for the positions at issue. *See* Joint Pretrial Statement (March 12, 1997). Webb moved to exclude Ridley and Foster on the ground that the District had not identified these individuals until March 6, 1997. *See* Plaintiff's Motion in Limine to Exclude Defendant's Proposed Witnesses and Evidence Related Thereto (March 18, 1997).

9. 29 C.F.R. § 1602.31 provides:
   Any personnel or employment record made or kept by a political jurisdiction (including but not necessarily limited to requests for reasonable accommodation, application forms submitted by applicants and other records having to do with hiring, promotion, demotion, transfer, layoff, or termination, rates of pay or other terms of compensation, and selection for train-

ing or apprenticeship) shall be preserved by the political jurisdiction for a period of 2 years from the date of the making of the record or the personnel action involved, whichever occurs later. In the case of involuntary termination of an employee, the personnel records of the individual terminated shall be kept for a period of 2 years from the date of termination. Where a charge of discrimination has been filed, or an action brought by the Attorney General against a political jurisdiction under title VII or the ADA, the respondent political jurisdiction shall preserve all personnel records relevant to the charge or action until final disposition of the charge or the action. The term "personnel record relevant to the charge," for example, would include personnel or employment records relating to the person claiming to be aggrieved and to all other employees holding positions similar to that held or sought by the person claiming to be aggrieved; and application forms or test papers completed by an unsuccessful applicant and by all other candidates for the same position as that for which the person claiming to be aggrieved applied and was rejected. The date of final disposition of the charge or the action means the date of expiration of the statutory period within which a person claiming to be aggrieved may bring an action in a U.S. dis-

which requires government entities to maintain all personnel files for two years from the making of the record or the date of the action involved and to preserve those records relevant to a filed charge of discrimination until final disposition of the charge. Because Webb had been terminated in June 1994, and the evidence showed that records from his personnel file had been destroyed in late 1994 or early 1995, the district court concluded that the District had engaged in a clear violation of the regulation. Next, the court rejected the District's claim that it did not have sufficient notice of which positions plaintiff intended to challenge, stating that Webb's second amended complaint, filed on May 12, 1992, named "the selectees for the positions [identified], together with the allegations of a pattern and practice of discrimination" and thus was "sufficient to put the District on notice that the relevant documents should have been retained." *Webb II,* 175 F.R.D. at 144. (The court was troubled, moreover, by the fact that the record indicated that "there was no procedure in place to ensure that relevant employment records were flagged so that they would not be destroyed." *Id.*) Finally, the court determined, based on the testimony adduced during the hearings, that the District knew of the requirement to preserve employment records and willfully chose to ignore it. *Id.* at 145. It thus held that some sort of sanction for the destruction of documents was appropriate and that, in accordance with the case law of this circuit, a default judgment was the only appropriate sanction.

Following this decision, the District proffered several summaries of sexual harassment claims involving Webb that had been submitted in other ongoing litigation and contended that Webb would ultimately have been discharged on harassment grounds even if he had not been terminated for discriminatory reasons.[10] On September 10, 1997, the court held that it would not consider this evidence [11] and awarded Webb$80,745.35 in back pay, $75,000 in compensatory damages,[12] and $4,018.93 for medical expenses.[13] The court also directed that the District rehire Webb to a DS–12 Special Assistant position, the position for which he applied in 1989, with "such other pecuniary compensation as one reinstated would be entitled to receive." [14] Joint Appendix ("J.A.") 60.

The District appealed. Before this court, the District does not contest the district court's conclusion that the District discarded

trict court or, where an action is brought against a political jurisdiction either by a person claiming to be aggrieved or by the Attorney General, the date on which such litigation is terminated.

The regulation thus requires that "an employer notified of a charge of discrimination preserve relevant personnel records until the charges' final disposition." *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1418 (10th Cir.1987). In her deposition, Murphy stated that she was "somewhat" familiar with this requirement, although she was unaware of how long records were to be maintained. *See Webb II,* 175 F.R.D. at 141. The District does not now challenge the district court's conclusion that it violated this regulation in the destruction of certain documents from its files.

10. The claim summaries were filed as part of the litigation in *Neal v. Director, Dist. of Columbia Dep't of Corrections,* in which the district court found that the District had tolerated widespread sexual harassment of female employees at the Department of Corrections. In *Bonds v. District of Columbia,* 93 F.3d 801 (D.C.Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 2453, 138 L.Ed.2d 211 (1997), this court reversed the discovery sanction imposed against the District in

*Neal* and remanded the case for further proceedings. The parties subsequently settled the case.

11. The court refused to consider the claim summaries because it believed the evidence went to the merits of Webb's case. Because a default judgment was entered against the District, the District had "lost the opportunity to challenge the merits of plaintiff's claims"; thus, "taking plaintiff's well-plead [*sic*] allegations as true, the court must conclude that this proffered reason [sexual harassment] was a pretext, and that plaintiff was fired in retaliation for complaining of race and gender discrimination." Joint Appendix 52.

12. In this regard, the district court noted that "[t]he branding of plaintiff by his employer as a sexual harasser was an egregious act that affected both plaintiff's professional and personal life." J.A. 58.

13. The district court also ordered, on December 2, 1997, that the District pay attorneys' fees in the amount of $207,294.25 and costs in the amount of $25,125.92. J.A. 121.

14. The monetary awards and injunctive relief were subsequently stayed pending appeal.

files relevant to Webb's claims in violation of federal regulations and thus that some sanction is appropriate. *See, e.g., Shepherd,* 62 F.3d at 1478 ("[A] district court may impose issue-related sanctions whenever a preponderance of the evidence establishes that a party's misconduct has tainted the evidentiary resolution of the issue."). It does challenge, however, the district court's conclusion that default was the only appropriate sanction for its misconduct and the requirement that Webb be reinstated to a supervisory position despite strong evidence of sexual harassment.

## II. Analysis

### A. The Default Judgment

■ A district court may order sanctions, including a default judgment, for misconduct either pursuant to Rule 37(b)(2) of the Federal Rules of Civil Procedure, which authorizes a court to assess a sanction for violation of a discovery order, or pursuant to the court's inherent power to "protect [its] integrity and prevent abuses of the judicial process." *Shepherd,* 62 F.3d at 1474. In *Shea v. Donohoe Construction Company,* 795 F.2d 1071 (D.C.Cir.1986), we set forth three basic justifications that support the use of dismissal or default judgment as a sanction for misconduct. First, the court may decide that the errant party's behavior has severely hampered the other party's ability to present his case—in other words, that the other party "has been so prejudiced by the misconduct that it would be unfair to require him to proceed further in the case." *Id.* at 1074. Second, the court may take account of the prejudice caused to the judicial system when the party's misconduct has put "an intolerable burden on a district court by requiring the court to modify its own docket and operations in order to accommodate the delay." *Id.* at 1075. And finally, the court may consider the need "to sanction conduct that is disrespectful to the court and to deter similar misconduct in the future." [15] *Id.* at 1077. A sanction imposed pursuant to any of these considerations must be based on findings

supported by the record. *Bonds v. District of Columbia,* 93 F.3d 801, 809 (D.C.Cir.1996), cert. denied, —— U.S. ——, 117 S.Ct. 2453, 138 L.Ed.2d 211 (1997).

■ Although our review of a district court's order of default under either source of authority looks only to whether an abuse of discretion has occurred, the review should be a thorough, not a cursory, one. *See, e.g., Bonds,* 93 F.3d at 808 (Rule 37(b)); *Shepherd,* 62 F.3d at 1475 (inherent power). We recognize the burdens and management responsibilities a heavy docket places on a district court, but we must be equally cognizant of the drastic nature of a default judgment, which deprives a party completely of its day in court. Because disposition of cases on the merits is generally favored, we have said that a default judgment must be a "sanction of last resort," to be used only when less onerous methods (for example, adverse evidentiary determinations or other "issue-related sanctions") will be ineffective or obviously futile. *Shea,* 795 F.2d at 1075 (internal quotation omitted); *Shepherd,* 62 F.3d at 1478. While we do not require a district court, in making this judgment, to exhaust lesser sanctions before turning to default, *see, e.g., Shepherd,* 62 F.3d at 1479, we do require that the court explain its reason for issuing a default judgment rather than a lesser sanction. This duty to explain arises out of two different, although related, concerns. Rule 37(b)(2) permits a district court to issue only such orders "as are just" in response to a party's failure "to obey an order to provide or permit discovery." Fed. R. Civ. P. 37(b)(2). The requirement that an ordered sanction be "just" imposes a duty on the district court, particularly in the case of severe sanctions, to give adequate consideration to "whether lesser sanctions would be more appropriate for the particular violation." *Bonds,* 93 F.3d at 808. When sanctions are ordered under the court's inherent power, the need to consider less onerous alternatives stems from the intrinsic need for self-restraint in using so powerful a weapon. *See, e.g., Chambers v. NASCO, Inc.,* 501 U.S.

---

**15.** Although *Shea* concerned dismissal ordered pursuant to Rule 37(b), we have also held that these considerations are appropriate when a district court orders dismissal pursuant to its inherent power. *See, e.g., Ripalda v. American Operations Corp.,* 977 F.2d 1464, 1466 (D.C.Cir.1992).

32, 44, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) ("Because of their very potency, inherent powers must be exercised with restraint and discretion."). Indeed, we have noted that in order to justify the use of a court's inherent power to order default, the court must give "a specific, reasoned explanation for rejecting lesser sanctions, such as fines, attorneys' fees, or adverse evidentiary rulings." *Shepherd,* 62 F.3d at 1478. A district court must state *why,* in light of the *Shea* factors, less onerous sanctions are not sufficient. Our task of appellate review of such orders, limited though it may be, cannot be properly exercised if we are not assured that the district court has fully considered whether harm caused by a party's misconduct may be rectified by sanctions short of default. *Cf., e.g., Outley v. City of New York,* 837 F.2d 587, 591 (2d Cir.1988) ("Before the extreme sanction of preclusion may be used by the district court, a judge should inquire more fully into the actual difficulties which the violation causes, and must consider less drastic responses."). Conclusory statements are not enough. Thus, in *Shepherd,* we held that although the district court had concluded that " '[i]mposition of a lesser sanction would only reward the defendants for their misconduct in this litigation,' " *id.* at 1480 (quoting *Shepherd v. ABC,* 151 F.R.D. 179, 192 (D.D.C.1992)), the court had not sufficiently explained *why* lesser sanctions would " 'only reward the defendants' and fail to provide meaningful deterrence and punishment for

the misconduct." *Id.* Rather, it had noted only that "[it] thought the misconduct was serious and imposing a default judgment was appropriate" without further explanation. *Id.* We thus felt obliged to remand for reconsideration of alternative sanctions by the district court.

◼ With these principles in mind, we proceed to examine the district court's order of default in this case under the framework set out in *Shea.*[16] First, we consider whether a default judgment can be justified as a necessary response to the prejudice suffered by Webb as a result of the District's document destruction or whether an issue-related sanction would have sufficed. We noted in *Shepherd* that the prejudice to the plaintiff engendered by the destruction of documents typically merits default in two instances: "where the destroyed document is dispositive of the case, so that an issue-related sanction effectively disposes of the merits anyway, and where the guilty party has engaged in such wholesale destruction of primary evidence regarding a number of issues that the district court cannot fashion an effective issue-related sanction." *Shepherd,* 62 F.3d at 1479 (citations omitted). We do not see that either of these circumstances is present in this case. The evidence suggests that the personnel files of District employees who apply for vacant positions are not reviewed during the selection process, *see* Affidavit of Louis Chaney, Feb. 3, 1997; Deposi-

---

**16.** The court noted that it had the power to order sanctions both under its inherent power and under Rule 37(b)(2). *See Webb II,* 175 F.R.D. at 143. As we have noted, authority to impose sanctions under Rule 37(b)(2) is triggered only by the violation of a production order issued by the district court. *Shepherd,* 62 F.3d at 1474; *Attorney General v. Irish People, Inc.,* 684 F.2d 928, 951 n. 129 (D.C.Cir.1982). The order at issue, dated March 1, 1997, directed the District to respond fully and completely to plaintiff's discovery requests by March 6, 1997, and to confirm its compliance in writing. *Webb II,* 175 F.R.D. at 132. In response to this order, the District provided, on March 6, supplemental responses to Webb's document requests and interrogatories but apparently did not provide written confirmation that the District had complied with Webb's discovery requests, as ordered by the court. To the extent that the default judgment was based on the District's failure to include a statement of confirmation in its responses, the sanction was

disproportionate to the fault. It is difficult to conceive of circumstances in which the act of failing to state that all relevant documents have been provided, even when that omission is in direct contravention of a court order, would justify a sanction as severe as a default judgment. To the extent that the default judgment was a response to the District's inability to respond fully to Webb's discovery requests due to its previous destruction of certain documents, we are doubtful that the judgment may be considered an exercise of the court's authority under Rule 37(b)(2), given that the document destruction took place well before the order compelling a response. (More important, the district court had already decided to impose sanctions when it issued the discovery order.) Because, as previously noted, our review proceeds in much the same manner whether the district court took its authority from Rule 37(b)(2) or from its inherent power, we need not resolve the issue here.

tion of Joan Murphy, Feb. 4, 1997; thus, any "temporary records" that might have been removed from Webb's personnel file are seemingly relevant only to Webb's claim of retaliatory termination. It does not appear from the evidence before us that the absence of such documents is dispositive of Webb's case or why an adverse inference as to these documents would not have sufficed to address any harm resulting from their destruction. First, the only "temporary records" of potential interest would be any "Corrective/Adverse Action Final Decision Letters" or "Official Reprimands" in the file.[17] We would have supposed that Webb would want to rely on the absence of any such documents in his file to argue that he was an exemplary employee; the fact that the District cannot prove that Webb was ever reprimanded would appear only to bolster his case. (Alternatively, the district court could have ordered that an inference adverse to the District be drawn that Webb had only favorable letters in his personnel file.) Second, as the district court suggested, see *Webb II*, 175 F.R.D. at 148, an adverse inference could even have included the existence of documents in Webb's personnel file that provided evidence of retaliatory intent (for example, an official reprimand that contained a phrase such as "if you continue to pursue these claims, you will be terminated"). Of

course, such an inference, even if accepted by the trier of fact, would not "effectively dispose of the merits": Even if Webb's claims were a "motivating factor" in the decision to terminate him, the District could still prevail if it could show "that it would have reached the same decision ... even in the absence of the protected conduct"—in this case, by producing sufficient evidence of Webb's sexual harassment activities. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); see also *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 512–13 (3d Cir.1997), cert. denied, — U.S. —, 118 S.Ct. 1516, 140 L.Ed.2d 669 (1998); *Tao v. Freeh*, 27 F.3d 635, 639 (D.C.Cir.1994).[18] We thus cannot agree with the district court's conclusion that "the only adverse inference that would adequately compensate plaintiff ... would effectively dispose of the merits of the claim." *Webb II*, 175 F.R.D. at 148.

We reach much the same conclusion with respect to the prejudice caused by the missing merit case files. These files might indeed have contained information helpful to Webb's nonselection case, such as the experience and education of other applicants and the determination of the qualifications of each applicant.[19] The absence of these docu-

---

**17.** In her affidavit, Adams stated that she located Webb's personnel folder in a box destined for a St. Louis records center. She further stated, "My review of the folder for Isaiah Webb retrieved from the St. Louis–bound box indicated to me that it had been processed for storage in the Federal Records Center because all the temporary records had been removed. Temporary records which could have possibly been removed are described in the attached copy of DC Standard Form 1258 and designated by the mark 'LS.' "

Form 1258 is titled "Government of the District of Columbia Official Personnel Folder Internal Audit Checklist." Documents designated as temporary records are the following:
1) DC OF–8, Positions Descriptions (All)
2) P.O. Form 12 (Excellent/Satisfactory)
3) DCSF–52 (Resulting in Personnel Form 1)
4) DCSF–52A
5) OMBS–90, Tax Withholding—Non-Resident
6) SF–127, Request for Personnel Records—NPRS
7) SF–1152, Designation of Beneficiary—Unpaid Compensation
8) DCSF–1231, Notification—Emergency

9) Corrective/Adverse Action Final Decision Letters under 3 years old
10) Designation of Essential Employee
11) Employee Notice of Furlough
12) Employee Notification—Drug Free Workplace
13) Official Reprimands under 2 years old
14) Personnel Action Proof List
15) Position Data Proof List
16) Proof of Residency, Chapter 3, DPM
Of these, only numbers 9 ("Corrective/Adverse Action Final Decision Letters") and 13 ("Official Reprimands") would appear to be relevant to Webb's case.

**18.** This rule is intended to ensure that an employee is not placed "in a better position as a result of the exercise of ... protected conduct than he would have occupied had he done nothing." *Mt. Healthy*, 429 U.S. at 285, 97 S.Ct. 568.

**19.** See Deposition of Joan Murphy, Feb. 4, 1997 (noting that the Office of Personnel reviews all applications, assigns scores for level of experience, education, and so on, and sends an alphabetical list of the "qualified" candidates to the selecting official).

ments was mitigated, however, by (1) the District's stipulation that it would not assert that applicants other than the final selectee were more qualified than Webb, *see Webb II*, 175 F.R.D. at 138; (2) the provision to Webb of the personnel file of Patricia Britton, the selectee for vacancy announcement 89–125; and (3) the submission, albeit delayed, of the names of the individuals who participated in the selection process. Each of these sources provides a way for Webb to discover any helpful evidence pointing toward the conclusion that his nonselection was discriminatory. We therefore cannot agree, on the basis of the current record, that lesser sanctions, such as a presumption that the missing files contained evidence favorable to Webb, would not suffice to overcome any prejudice suffered by Webb as a result of the destruction of the files.[20] And to the extent that the documents would have shown that Webb's own qualifications were incorrectly evaluated by the Office of Personnel, Webb can make that case independently through deposing Office of Personnel workers and asking them to explain the process for scoring qualifications. We therefore are not convinced by the district court's conclusion that Webb was "so severely prejudiced by the District's conduct that it would be unfair to require [him] to proceed with the trial because no lesser alternative [could] compensate [Webb] for the loss of evidence caused by the destruction and delay of [the District]." *Webb II*, 175 F.R.D. at 145.

■ We next consider the extent to which the document destruction caused prejudice to the judicial system. Although the district court stated that the District's conduct "ha[d] occupied the court's attention with many hearings and motions" and thus frustrated the court's ability to provide "swift justice" to the litigants appearing before it, *id.* at 146, the court's primary concern, at least with respect to Webb's nonselection claims, seems to have been the delay in furnishing some information until the month of trial rather than the scope of the information provided. *See, e.g., id.* at 145 ("By delaying the disclosure of these names [of individuals participating in the selection process] for so long, defendant thwarted plaintiff's ability to prepare for trial. This injury is directly traceable to defendant's conduct: if the files had not been destroyed, the information sought would have been readily available.").[21] It therefore seems that any prejudice to Webb on this account could have been remedied by a continuance of the trial date sufficient to permit him to depose the individuals identified by the District, perhaps with costs to be paid by the District. The district court did not adequately state why such continuance would not be feasible, noting merely that "the only way for the court to guarantee a timely outcome was to set a trial date, and enforce it." *Webb II*, 175 F.R.D. at 146. Of course, we are cognizant of the district court's need to manage its schedule, and its calendar should not be subject to the whims of recalcitrant litigants. *See, e.g., Shea*, 795 F.2d at 1076 ("[W]here a party or counsel

**20.** Such a presumption is a common sanction in response to the destruction of documents. *See, e.g., Favors v. Fisher*, 13 F.3d 1235, 1239 (8th Cir.1994); *Hicks*, 833 F.2d at 1419; *Shipley v. Dugan*, 874 F.Supp. 933, 940 (S.D.Ind.1995) (citing cases). (The fact that, as the district court stated, the District failed to propose an adequate jury instruction containing an adverse inference presumption, *see Webb II*, 175 F.R.D. at 148, should not cabin the scope of the district court's efforts in this regard.) The most reasonable inference to be drawn that would not be inconsistent with other evidence would seem to be that no applicant who was not selected was more qualified than Webb. It is conceivable, although unlikely, that the destroyed documents contained marginal notes and the like that reflected discriminatory intent. Although an adverse inference presumption should not test the limits of reason, Webb would certainly be entitled to make

such an argument; the District, likewise, would be entitled to attempt to rebut it.

**21.** Although we noted in *Shea* that "prejudice to defendants resulting from unreasonable delay may be presumed," we also stated that where the delay is not unreasonable, "the need to show actual prejudice is proportionally greater." *Shea*, 795 F.2d at 1075 (internal quotation omitted). While it is true that, as the district court noted, this litigation began in 1990, it was not until 1996 that Webb, with the aid of counsel, filed his fourth amended complaint, which narrowed the focus of his claims from over one hundred positions to only three positions (two of which remain) and added an additional claim of retaliatory termination. It thus may be more appropriate to measure the effect of the delay using 1996, rather than 1990, as a benchmark.

announces at the last minute that he cannot participate in a scheduled trial, the District Court is not required to disrupt its well-planned trial schedule to find a new date for the missed trial."). But it is not apparent to us from the record below that a continuance would place an *"intolerable* burden" on the district court, *id.* at 1075 (emphasis added), or that the court's continued involvement in the discovery dispute would continue to call on far more resources into the future than the system should be required to allocate to the case. (Although the discovery period had ended two weeks prior to the District's identification of the selecting individuals on March 6, 1997, trial was set for nearly three weeks later, leaving some room for the court to maneuver.) The district court's conclusion that "an adverse inference could not have compensated for the delay suffered by plaintiff and the resulting inability to prepare for trial," *Webb II,* 175 F.R.D. at 148, standing alone, tells us nothing about the availability of a continuance to permit Webb to depose the named individuals. We thus cannot conclude, without further explanation from the district court, that any systemic harm suffered by the district court warranted a default judgment.

█ Finally, we might uphold the judgment of default under *Shea* had the district court adequately established why no other sanction would adequately deter the District from committing similar misconduct in the future. Here, again, we conclude that the record as it now stands does not support such a finding. Although the district court stated that the District "must be deterred from continuing to consciously disregard the retention regulations," *Webb II,* 175 F.R.D. at 147, it did not explain why lesser sanctions would not achieve the same effect; indeed,

we were informed by the District after oral argument that steps have been taken to alert District of Columbia employees as to their obligations under federal regulations to preserve employment records. *See* Letter from Donna M. Murasky, Assistant Corporation Counsel (May 15, 1998). Moreover, as this court noted in *Bonds,* if the sanction of default is based only on deterring future misconduct, "the more severe sanction [of default] must be supported by a finding of flagrant or egregious misconduct by the defendant." *Bonds,* 93 F.3d at 809; *see also Weisberg v. Webster,* 749 F.2d 864, 871 (D.C.Cir.1984) (dismissal pursuant to Rule 37(b)(2) must be based on "willfulness or at least gross negligence"). Although the District now concedes that it failed to recognize its responsibility under 29 C.F.R. § 1602.31, we do not think that its failure rose to the level of flagrant or egregious misconduct. The record does not reflect that, for example, the District deliberately discarded documents relating to Webb's case in an attempt to destroy key evidence or that its delay in responding to Webb's discovery requests was an intentionally dilatory effort to "gain an unfair tactical advantage over its litigation opponent." *Bonds,* 93 F.3d at 812; *cf. Synanon Church v. United States,* 820 F.2d 421, 423, 428 (D.C.Cir.1987) (affirming dismissal based on party's "willful, deliberate and purposeful scheme" to destroy evidence) (internal quotation omitted). Rather, it seems clear from the record that the District's fault lay in failing to recognize that its general practice of discarding files after a set period of time would result in the destruction of materials relevant to litigation and failing to notify employees systemwide of the federal regulations that imposed a duty to retain such materials.[22] This lack of compliance is

---

22. Although the district court found that there was evidence that "at least one District personnel official, Joan Murphy, had knowledge of the existence of EEOC regulations requiring maintenance of documents, yet was unaware of any procedure by which the District would flag relevant files once litigation ha[d] been initiated" and thus that "the District knew of the requirement, but chose to ignore it," *Webb II,* 175 F.R.D. at 145, the portion of Murphy's testimony the court cites in support of this conclusion seems more equivocal:

Q: Are you aware of—are you familiar with the EEOC regulations regarding the destruction of documents? ·

A: Somewhat, yes.

Q: And what do you know about those regulations?

A: I know that they're supposed to be maintained, but I don't recall—I have not seen it in writing and I don't recall the duration.

Q: Is there any manner by which the District flags the merit case files for which litigation has been initiated?

certainly serious, and must be addressed, but it does not appear to us to warrant sanctions as severe as default.

▮ At this point, then, we are not persuaded that a default judgment was the only punitive option available to the district court. Because, however, we recognize that *Shea*'s analytical framework "is not to be applied woodenly in evaluating the myriad and diverse factors that influence district judges in managing their caseloads," *Bristol Petroleum Corp. v. Harris*, 901 F.2d 165, 167 (D.C.Cir.1990), we will refrain from substituting our judgment for the district court's. Instead, we vacate the judgment and remand to the district court for further consideration of less onerous sanctions.[23]

### B. *The Remedy*

▮ Because we are remanding this case for further proceedings, we address the propriety of the district court's order directing that Webb be rehired to a DS–12 Special Assistant position, since if Webb prevails on the merits of his unlawful termination claim, or if the district court sufficiently justifies its sanction of default, the issue of the appropriate remedy will once again come to the fore.

▮ As a general rule, a district court "has broad discretion to fashion appropriate equitable relief for a Title VII plaintiff" including, but not limited to, reinstatement; this court's review is therefore limited to determining whether the district court abused that discretion. *Castle v. Rubin*, 78 F.3d 654, 657 (D.C.Cir.1996) (citing 42 U.S.C. § 2000e–5(g)(1) (1993)); *Johnson v. Brock*, 810 F.2d 219, 224 (D.C.Cir.1987). Generally,

we would not disturb a district court's decision to order reinstatement as a remedy for a Title VII violation. We think it important to recognize, however, that a successful Title VII plaintiff is entitled only to *appropriate* equitable relief, *see, e.g.*, 42 U.S.C. § 2000e–5(g)(1) (1994); *Castle*, 78 F.3d at 657, a determination that authorizes a district court to take into account "extraordinary equitable circumstances that affect the legitimate interests of either party," *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 362, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995).[24] In this case, the decision to reinstate Webb to a supervisory position with the District was made without any consideration of evidence that suggested that reinstatement may not have been an appropriate remedy—namely, the claims of several employees with the District that they had been harassed, sexually and otherwise, by Webb. Because that evidence would have been relevant to the determination of whether reinstatement[25] was an appropriate remedy, we direct the district court on remand, should the remedy phase be reached, to permit the District to submit such evidence.

▮ Although reinstatement is certainly a preferred remedy in Title VII cases, it may not always be an appropriate one. Whether reinstatement is indeed appropriate may be determined only after careful consideration of the circumstances of a particular case. *See, e.g., Hudson v. Reno*, 130 F.3d 1193, 1202 (6th Cir.1997), *petition for cert. filed*, 66 U.S.L.W. 3791 (U.S. Jun. 8, 1998) (No. 97-1987); *McKnight v. General Motors Corp.*, 973 F.2d 1366, 1370 (7th Cir.1992). Courts

---

A: I don't know.
Q: Do you know who would know that information?
A: No.
Q: Are you the person that would know?
A: I don't know.

*Id.* at 141–42 (quoting Transcript at 293).

**23.** Despite the district court's contention below that "[i]f this case were to be remanded with instructions to construct a lesser sanction, the court would be unable to do so," *Webb II*, 175 F.R.D. at 148 n. 16, we are confident that further exploration of the issue will either reveal the availability of alternative sanctions or result in a more complete explanation of why such sanctions were deemed to be inappropriate. Al-

though we could undertake this investigation ourselves based on the record before us, we continue to believe, as in *Bonds*, that "in light of the deferential standard of review a statement of reasons from the district court [is] advisable." *Bonds*, 93 F.3d at 804 n. 4.

**24.** This court noted in *Castle*, that although *McKennon* arose under the Age Discrimination in Employment Act, "its principles clearly apply in Title VII actions." *Castle*, 78 F.3d at 658.

**25.** We use the term "reinstatement" here to refer to reemployment with the Department of Corrections and not to suggest that Webb held a Special Assistant position prior to his termination.

have, for example, deemed reinstatement to be inappropriate when there is "evidence of extreme animosity" between the plaintiff and the defendant employer, *see Williams v. Valentec Kisco, Inc.*, 964 F.2d 723, 730 (8th Cir.1992) (internal quotation omitted); or where the employer has expressed "genuine dissatisfaction" with the plaintiff's job performance, *see Hudson*, 130 F.3d at 1202. In these circumstances, although reinstatement would technically make the plaintiff whole, larger considerations of the relationship between the plaintiff and the employer and, indeed, the environment in which their relationship is situated, militate against ordering reinstatement. *Cf., e.g., Ford Motor Co. v. EEOC*, 458 U.S. 219, 239, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982) (rights of "innocent third parties" may be considered in devising Title VII remedy); *Thomas v. National Football League Players Ass'n*, 131 F.3d 198, 207 (D.C.Cir.1997) (district court "reasonably concluded that reinstatement would not serve the interests of justice where the employee engaged in behavior that could conceivably have given rise to a legitimate discharge under other circumstances"); *Lander v. Lujan*, 888 F.2d 153, 157 (D.C.Cir.1989) (suggesting that "[i]t may well be appropriate, perhaps even required," that a district court consider the impact of reinstatement on displaced employee).

In Webb's case, the record contains evidence that suggests that reinstatement to a supervisory position within the Department of Corrections may not be an appropriate remedy.[26] The seven *Neal* claim summaries proffered by the District, if credited, suggest that Webb has engaged in repeated sexual harassment of the co-workers whom he supervised, including unwanted physical contact, *see, e.g.*, J.A. 65 (claim summary of Karen Dudley) ("Webb stuck his hand in her pants, grabbed her belt buckle and pulled her towards him. Ms. Dudley pushed him away and told him not do to that."); J.A. 86 (claim summary of Evella Fisher) ("Capt. Webb approached Ms. Fisher, began feeling her breasts and said 'I like breast milk.' At one point, Capt. Webb actually reached underneath Ms. Fisher's blouse and took her breast out, feeling and squeezing it further. Ms. Fisher began crying and quickly left Capt. Webb's office."); unwelcome sexual advances, *see, e.g.*, J.A. 102 (claim summary of Norma Rose Jackson) ("... Captain Webb called Ms. Jackson into his office, locked the door from the inside, and then requested that Ms. Jackson perform oral sex on him.... Ms. Jackson refused Captain Webb's request for oral sex, but Captain Webb persisted in making unwelcome sexual advances on Ms. Jackson"); and intimidation, *see, e.g.*, J.A. 73 (claim summary of Thyra Griffin) ("Captain Webb looked directly at Lt. Griffin and indicated

---

**26.** Even assuming that default was an appropriate sanction, we believe the district court failed to distinguish between the claims allegedly underlying Webb's termination (the complaints of Shank and Stevens) and the claims offered by the District in support of its contention that reinstatement was inappropriate (the seven *Neal* claim summaries). Once default had been entered, each of Webb's "allegations of fact [were to] be taken as true and each of [his] claims ... considered established as a matter of law." *Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co.*, 771 F.2d 5, 13 (1st Cir.1985); *see also Black v. Lane*, 22 F.3d 1395, 1399 (7th Cir.1994) ("When a default judgment is entered, facts alleged in the complaint may not be contested."); 10 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2688 (2d ed.1983). If default is again determined to be an appropriate sanction, the district court would thus be justified in crediting Webb's allegation that "[a]lthough [the District] has alleged that [his] termination was the result of sexual harassment charges brought by two DOC em-

ployees, the sexual harassment charges are without basis and provided a mere pretext that [the District] has used to justify its illegal conduct." Fourth Amended Complaint (Nov. 1, 1996), at 10; *cf. In re Docteroff*, 133 F.3d 210, 215 (3d Cir.1997) ("To hold otherwise would give litigants who abuse the processes and dignity of the court an undeserved second bite at the apple."). Significantly, however, Webb's complaint made no allegations as to the veracity of any of the claims filed in the *Neal* litigation. Thus, even if default was warranted, it was error for the district court to hold that these claims could not be considered simply because the claims of Shank and Stevens were necessarily deemed to be groundless. *Cf. In re Dierschke*, 975 F.2d 181, 185 (5th Cir.1992) (noting that "fundamental fairness[ ] dictate[s] that a judgment by default operates as a deemed admission only as to the relief requested in the complaint"). Of course, should Webb's case proceed to trial on remand, the District would be entitled to show that Shank's and Stevens's claims did in fact constitute the reason for Webb's termination.

that 'I'm the master chess player here and if you don't like it you can meet me on the parking lot, better still, you can meet me on 19th Street and deal with this 300 lb. African.' "). While we by no means suggest that these allegations proffered by the District should be accepted on face value—that is, without the benefit of a hearing in which Webb is permitted to contest them—we do think the district court erred in excluding this evidence altogether in determining whether reinstatement to a supervisory position was appropriate.[27]

### III. CONCLUSION

Our holding today should not be construed as any condonation of the District's conduct during the prolonged discovery phase in this case. Its failure to institute a citywide policy to ensure that documents relevant to litigation were not routinely destroyed and its less than direct responses to discovery requests without doubt complicated and extended the discovery process in this case. On the basis of the record before us, however, we are not convinced that a default judgment was an appropriate response to the District's misconduct. We conclude both that the district court did not adequately consider discovery sanctions other than a default judgment and that it improperly rejected evidence relevant to the propriety of reinstatement. We therefore vacate the default judgment against the District, as well as the order awarding attorneys' fees and costs, and remand for further proceedings.

*It is so ordered.*

---

27. In *McKennon*, the Court held that if evidence acquired after an unlawful termination showed wrongdoing "of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge," 513 U.S. at 362–63, 115 S.Ct. 879, reinstatement generally would be an inappropriate remedy. *See id.* at 362, 115 S.Ct. 879 ("It would be both inequitable and pointless to order the reinstatement of someone the employer would have terminated, and will terminate, in any event and upon lawful grounds."). The parties agree that the events alleged in three of the *Neal* claim summaries were made known to the District after Webb's 1994 termination; those summaries should therefore have been considered by the district court. Although the District does not contest Webb's claim that the events described in the other four *Neal* claim summaries were brought to the District's attention well in advance of Webb's 1994 termination and yet did not result in his discharge, we do not believe that the time frame renders these four summaries irrelevant. To begin with, the extent of the District's knowledge of the events in those summaries is unclear from the record before us. It may be the case that those with the authority to take action were left uninformed, in which case the four earlier summaries may well be considered "after-acquired evidence" that would have led to Webb's discharge in any event. Moreover, even if the District chose not to terminate Webb after receiving the first four complaints, it is entirely possible it would have chosen to terminate him once three more complaints had been brought to its attention. Thus, even if only three of the *Neal* complaints were technically "after-acquired evidence," the cumulative effect of all seven complaints may have been weighty enough that the District would, in fact, have ultimately terminated Webb in response to the events alleged. We are not in a position, on the basis of this record, to judge what action the District might have taken in response to these allegations. Should the district court determine that Webb would have been terminated, however, it would be not only "inequitable and pointless" but also potentially harmful to reinstate Webb to a supervisory position within the Department of Corrections, particularly given the acknowledgment of the District, and this court, that "sexual harassment is a long-standing problem at the Department of Corrections." *Bonds*, 93 F.3d at 804.